

# OFFICE OF
# THE ATTORNEY GENERAL
## AUSTIN, TEXAS

PRICE DANIEL
ATTORNEY GENERAL

September 25, 1947

Hon. L. A. Woods
State Superintendent of Public Instruction
Department of Education
Austin, Texas

Attn:  Hon. T. M. Trimble,  Opinion No. V-388
First Assistant

Re:  Necessity for school
district to meet the
minimum teacher's
salary required under
H. B. 300, 50th Leg-
islature.

Dear Sir:

We refer to your letter of recent date which reads in part as follows:

"At the request of Mr. Henry Stilwell, Superintendent of the Texarkana Schools, I am submitting the following questions for your consideration and opinion:

"The Texarkana School has 1500 Negro scholastics, with approximately 400 in the Dunbar Negro High School, which is listed in the Standards and Activities Bulletin as an accredited school. Mr. Stilwell now claims that he is no longer asking that the Dunbar School be on the accredited list, since this would force the Board of Trustees to pay the Negro teachers on the same salary schedule as the white teachers.

"H. B. 300, an Act of the 50th Legislature, Regular Session, as interpreted by the State Superintendent, means that an accredited school system such as Texarkana must operate both, an accredited Negro school and an accredited white school, or must be seeking accreditation for their Negro school and pay their teachers the same salary schedule.

"Mr. Stilwell would like to know
first if the State Superintendent is act-
ing within his rights in determining that
an accredited school system such as Texar-
kana must be seeking accreditation for
their unaccredited Negro School; and second,
in order to avoid the penalty clause for
failing to pay all Negro teachers the same
salary as the white teachers he would like
to know whether the provision of Sec. 3 of
H. B. 300, which directs the State Super-
intendent to remove a school from the ac-
credited list of schools, is constitutional?"

Section 1 of H. B. 300, 50th Legislature, in
mandatory language requires that the board of trustees
of each and every Texas school district maintaining an
accredited or affiliated elementary or high school, or
seeking accreditation or affiliation, shall pay their
teachers upon a salary schedule, which salary schedule
shall provide a minimum beginning salary for a full
time teacher of not less than (1) $2000.00 per year and
(2) with increments above the minimum for (a) addition-
al college training and (b) for experience and effi-
ciency in teaching. Such increments shall be paid upon
the schedule provided by the State aid law (H. B. 295,
50th Leg.). Section 1 requires further that beginning
teachers in such school districts who do not have pre-
vious teaching experience but who hold a bachelor's
degree or better shall be paid a minimum beginning sal-
ary of not less than $2,000.00, and that teachers who do
not have such a degree shall be paid upon the salary
schedule provided in the State Aid Law.

Section 1 applies to all school districts main-
taining such an accredited or affiliated school, or seek-
ing accreditation or affiliation, whether the district be
self-operating or receiving State aid. There is no impli-
cation in H. B. 300 that a school district must be subject
to or eligible under the provisions of the State Aid Law
before H. B. 300 will apply thereto. Rather than incor-
porate in full the salary schedule and the increment sched-
ule provisions of the State Aid Law into H. B. 300, the
Legislature has seen fit to incorporate same by reference
for the purposes therein set out, which it may legally do.
Furthermore, it is clear the Legislature has specifically
made the provisions of H. B. 300 apply impartially to all
the teachers of such school districts regardless of race.

It should be observed also that H. B. 300 is a minimum salary law.  It does not attempt to fix the maximum salary which a district may pay its teachers.  School districts may provide larger salaries above the minimum requirement of this bill for those of its teachers who deserve monetary recognition for their efficiency in teaching.  The increment schedule of the State Aid Law, H. B. 295, Article III, Section 2, provides increments only for additional college training and increments for teaching experience.  There are no fixed increments providing for teaching efficiency except to the extent that teaching efficiency may be regarded as the natural result of teaching experience, but a district which meets the minimum requirements may adopt a schedule for higher salaries based on efficiency and other valid considerations.

Section 2 of H. B. 300 is a recognition on the part of the Legislature that some school districts maintaining an accredited or affiliated school or seeking accreditation or affiliation may not be able to meet the minimum salary requirements set out in Section 1 because of the insufficiency of school revenues.  Section 2 provides in substance that if the total revenue of any school district will not permit the payment of the salary requirement and increment schedule referred to in Section 1, when the total amount received from the State per capita plus all additional State or Federal aid (except grants for school lunches) plus 40% of total current local maintenance tax are devoted to the payment of salaries of teachers, principals and supervisors, then the highest salaries possible with revenue available shall be paid by such district to its teachers.  This means that all such school districts not having sufficient revenues to comply fully with the provisions of Section 1 of H. B. 300, shall comply as nearly and completely as possible with Section 1 and to the extent that the revenues itemized in Section 2 will permit.  For example, if the total revenue of a district earmarked by Section 2 to be considered in the payment of its teachers' salaries is but 90% of the total amount needed to comply fully with Section 1 of said bill, then such a district shall pay teachers' salaries on a 90% salary schedule, the highest salaries possible with the revenue available.  The fact that any such school district cannot comply fully with the minimum salary requirements of Section 1 of said bill and thus comes within the provisions of Section 2, does not relieve it from the other statutory requirements and obligations of Section 1.  In the instant example, all the teachers' sala-

ries of such a 90% district should be at least 90% of what said minimum salaries would be if the district could financially conform to Section 1 of H. B. 300.

We are requested to pass upon the constitutionality of Section 3 of H. B. 300.  Section 3 imposes a statutory duty on a body designated as the Committee of Affiliation and Accreditation.  It is the duty of said Committee to require evidence from the State Superintendent acting through his Deputy State Superintendents, showing (1) that the provisions of H. B. 300, Section 1, are being fully complied with, or (2) that the salary schedule actually being paid is approved by both the State Superintendent and the State Board of Education, before any school of any such district is affiliated or accredited or continued on the list of affiliated or accredited schools.  Under Section 2, such school districts are required to submit their salary schedules for the payment of their teachers to the State Superintendent and through him to the State Board of Education for approval.

The State Superintendent of Public Instruction is a statutory officer (Article 2655) and his general duties are outlined in Articles 2656 and 2657, V. C. S. He is charged with the administration of the school laws and is given the superintendency of matters relating to the public schools of this State.  Article 2657, V.C.S., provides:

> "The State Superintendent shall advise and counsel with the school officers of the counties, cities and towns and school districts as to the best methods of conducting the public schools, and shall be empowered to issue instructions and regulations binding for observance on all officers and teachers in all cases wherein the provisions of the school law may require interpretation in order to carry out the designs expressed therein, also in cases that may arise in which the law has no provision, and where necessity requires some rule in order that there may be no hardships to individuals, and no delays or inconvenience in the management of school affairs." (Emphasis ours)

Under Article 2678a, 2679 and 2681, V.C.S., the Department of Education has been authorized to classify

and/or to prescribe rules and regulations for the classification or ranking of every elementary school and high school of Texas. The legal basis for this classification, ranking, or accreditation of Texas schools by the Department of Education acting through its head, the State Superintendent, finds its origin in Sections 3 and 5 of Chapter 36, Acts 1915, 34th Legislature, R. S., the provisions of which may be traced and found in the above enumerated statutes. Articles 2888 and 2889, V.C.S., further authorize the State Superintendent to classify, rank or credit the institutions of higher learning in this State. Nixon Clay Commercial College v. Woods, 176 S.W. (2d) 1015.

Since September 1916, the work of classification, accreditation and affiliation of the schools of this State has been carried on by a committee under the chairmanship of the State Superintendent of Public Instruction, which is described and consists of school representatives named in the general manner set out in the Regulations, Standards and Activities Bulletin No. 469, published by the Department of Education, pages 1 to 6 inclusive. This committee is the body adopted and referred to by the Legislature in its H. B. 300 as the Committee on Affiliation and Accreditation. For 31 years now this committee has been recommending and revising the rules which should govern in the matter of classification and accreditation of public schools and the State Superintendent has exercised his statutory discretion found in Article 2657 in adopting same and prescribing such adopted recommendations as rules and regulations of the Department of Education on classification and accreditation matters.

The rules and regulations of the Department of Education on the accreditation and affiliation of the public schools of Texas, when not in conflict with the laws of this State, have the same force and binding effect of a statute. Bear v. Donna Independent School District, 85 S.W. (2d) 797; 56 C. J., pages 333 and 489. Had this committee method of practice used by the Department of Education in the formulation of its present rules and regulations or, indeed, the rules and regulations themselves, been contrary to the views of the Legislature, it is reasonable to presume that statutes governing the State Superintendent in these matters would have been amended long ago to meet such contrary views. Slocomb, et al, v. Independent School District, 116 Tex. 289, at 298.

Under Article VII, Section 1, Constitution of Texas, it is the duty of the Legislature to establish and make suitable provision for the support and maintenance of an efficient system of public free schools. Since it was necessary to establish and maintain a Department of Education to effectuate this provision, the Legislature has the undoubted power to delegate to said Department such power and authority as may be necessary to accomplish the end intended. The Legislature could not possibly foresee all of the problems that would arise in the administration of the schools. Necessarily, the Department of Education is given a wide discretion in such matters. It may make all such rules and regulations as in its judgment are necessary to maintain an efficient system of schools, subject to the provisions that such regulations be not arbitrary, unreasonable or in violation of law. Mosely v. City of Dallas, 17 S.W. (2d) 36; R.C.L., Vol. 24, p. 575; Wilson v. Abilene Independent School District, 190 S.W. (2d) 406.

Until the passage of H. B. 300 by the 50th Legislature, matters concerning the classification and accreditation of schools have been left entirely within the discretion of the State Superintendent, who has exercised such discretionary authority by prescribing the present rules and regulations found in the submitted bulletin upon the recommendations of the Committee on Affiliation and Accreditation. Bulletin, pages 16, 17, 46, 47, 48 and 49. Section 3 of H. B. 300 imposes the first and only statutory duty on the said committee which has come to our attention. Said committee may not now, by reason of Section 3, recommend the accreditation or affiliation of any school of any district which does not conform to the minimum salary provisions of Section 1 and/or Section 2 of H. B. 300, nor may it recommend the continuance of any school of any district on the accredited or affiliated list where any school of any district fails or refuses to meet the provisions thereof.

The authority to classify or accredit schools does not rest, as seems to be contended in this opinion request, in the board of trustees of a local school district. Such authority lies in the State Superintendent who has been empowered under statutes hereinabove enumerated to promulgate rules and regulations on such matters. District Trustees v. Trustees of Freestone County, 186 S.W. (2d) 378; District Trustees v. County Trustees, 197 S.W.(2d) 579. Such existing discretionary power is, of course, subject at all times to the general laws of

the Legislature which may increase, modify or change the statutory power existing in his office.

We are advised that the Dunbar Negro High School in the Texarkana Independent School District is an accredited school. H. B. 300 applies impartially to all school districts maintaining an accredited school. The Legislature has seen fit to draw no distinction as between white and colored schools in this enactment. In this the Legislature has followed Article VII, Section 7, of the Texas Constitution, which provides for separate schools for white and colored children and says, "impartial provision shall be made for both." If the Legislature had this particular provision in mind, no doubt it was due to the fact that the Supreme Court of the United States has held on numerous occasions that segregation (separate schools for whites and negroes) can be lawfully enforced only when such separate schools furnish substantially equal facilities.

Applying H. B. 300 to the Texarkana Independent School District which maintains one or more accredited white and one or more accredited negro schools, it follows that no school in the district may be continued on the list of accredited schools, if the district does not conform to the minimum salary requirements set out in Sections 1 and /or 2 of this Act.

To permit a school district to comply with the minimum salary provisions of H. B. 300 with respect to some of its accredited schools or some of its schools seeking accreditation and not to comply therewith with respect to all other accredited schools and schools seeking accreditation within its confines would be to permit a school district to classify and accredit its own schools, a power and authority which it does not have under the law. Such an interpretation of Section 3 would amount to a repeal by implication of all the statutes governing the accreditation of schools. To construe Section 3 of H. B. 300 as permitting such a practice would remove the enforceability of Section 1 and Section 2 of the Act, for unless Section 3 be construed to apply to the continuance or discontinuance on the list of all the accredited schools or school seeking accreditation of a district which complies or fails to comply with H. B. 300, it has no meaning or force. It will not be presumed that the Legislature intended to enact a useless piece of legislation. Further, to permit the practice contended for herein

would be to allow a local school district to discrimi-
nate with respect to its negro and white schools, an
act which would destroy all hope of maintaining the
segregated system of separate schools for negroes under
the terms of both the Texas Constitution and the Consti-
tution of the United States.

To strike down Section 3 also would destroy
the constitutional authority exercised by the Legisla-
ture in providing a penalty for school districts which
fail to pay their white teachers the minimum salaries
provided for from the large appropriation made specifi-
cally and primarily for the much needed raise of teach-
ers' salaries throughout the State.  The intent of Sec-
tion 3 was publicly known to prevent certain districts
from using the extra money for buying uniforms, building
repairs, reduction of local school taxes, and other such
purposes instead of using it for increased teachers'
salaries.  The revenues here involved are school reve-
nues, arising by virtue of legislative enactments, and
are public funds.  It has been held many times that the
Legislature through the enactment of general laws has
plenary power in the management and operation of school
districts to devote a certain amount of their revenue to
the payment of teachers' salaries.  Fawlkes v. Wilson,
171 S.W. (2d) 958; Fennell v. School District No. 13,
187 S.W. (2d) 187; Art. VII, Sec. 3, Constitution of
Texas.

For the reasons stated hereinabove, it is our
opinion that the Legislature had the power to provide such
penalty to insure the receipt by Texas school teachers of
the money intended for their increased salaries, and that
Section 3 of H. B. 300 is constitutional.

## SUMMARY

Sec. 3 of H. B. 300, Regular Session, 50th
Leg., providing the penalty of loss of accre-
ditation of schools in any district which fails
to meet the required minimum teacher salary
schedule, or the highest possible schedule with-
in their financial ability, is constitutional.
If a district meets the minimum salary schedule,
higher salaries may be paid on the basis of ef-
ficiency, training, experience and other con- .
siderations.  In H.B. 300 the Legislature has
provided for uniform higher salaries for all
school teachers without discrimination due to
race.  Such impartial provision for both white

and negro schools is in accordance with Article VII, Sec. 7 of the Texas Constitution, and is the only legal means of maintaining segregated schools for white and negro pupils under the Constitutions of Texas and the United States and the decisions of the United States Supreme Court. The penalty was primarily intended to insure the actual use of additional money furnished school districts for teachers' salaries rather than for other school purposes.

Very truly yours

ATTORNEY GENERAL OF TEXAS

By *Chester E. Ollison*

Chester E. Ollison
Assistant

CEO:djm:jrb

APPROVED:

*Price Daniel*

ATTORNEY GENERAL